**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **AZIZ A. LATIF** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **A-07-CV-644-LY** |
| | § | |
| **GARY LOCKE**[1] | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Summary Judgment, filed on May 18, 2009

(Clerk's Docket No. 22); Plaintiff's Response to Defendant's Motion for Summary Judgment, filed

on June 17, 2009 (Clerk's Docket No. 26); and Defendant's Reply to Plaintiff's Response to

Defendant's Motion for Summary Judgment, filed on July 1, 2009 (Clerk's Docket No. 29).

On July 7, 2009, the District Judge referred the above to the undersigned Magistrate Judge

for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil

Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court

for the Western District of Texas, Local Rules for the Assignment of Duties to United States

Magistrate Judges.  After reviewing the parties' briefs, relevant law, as well as the entire case file,

the undersigned issues the following Report and Recommendation.

## I.  BACKGROUND

Plaintiff Aziz Latif ("Latif") filed the instant suit against Defendant Gary Locke, in his

official capacity as the Secretary for the United States Department of Commerce, alleging that he

---

[1]The previous named Defendant in this action was Carlos Gutierrez.  Gary Locke was sworn into office on March 26, 2009, replacing Carlos Gutierrez as Secretary of Commerce.  Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Gary Locke is automatically substituted as a party.

was discriminated against while working for the U.S. Census Bureau due to his religion. The facts giving rise to Latif's claims are as follows.

Latif began working as a Recruiting Assistant ("RA") for the Local Census Office in Austin, Texas in May of 2005. The RA's worked in the field and generated job applicants by advertising and talking to potential candidates about the job opportunities available with the Census Bureau. In other words, the RA's purpose was to generate an interest in working for the Census Bureau. RA's were responsible for putting up posters, distributing flyers, locating space for testing applicants, scheduling and testing job applicants in a group setting, monitoring the testing sessions, scoring the tests, and reviewing the application forms. *See* Allen Decl. at ¶ 10.[2] RA's worked irregular hours and were mostly unsupervised; however, they were required to attend some specific meetings and work specific activities such as the "blitz" operations. *Id.* at ¶ 11.

RA's were encouraged to perform recruiting activities at a variety of locations, including community centers, community events, houses of worship, grocery stores, bookstores, barbershops, and residential neighborhoods or apartment complexes. *Id.* at ¶ 12; *see also* Drazic Decl. at ¶ 8. RA's were required to submit a Daily Pay and Work Record (Form DD-308), indicating the hours that they worked each day, the locations where they worked or visited, and their mileage. RA's were also required to submit a "PRISMS Data Entry Form" which indicated, among other things, the name and address of the organization they had contacted, the date of the contact, the person with whom they spoke, and the method of contact (phone, e-mail, visit, etc.). Allen Decl. at ¶ 13.

_____

[2]The declarations and affidavits referred to in this background section are attached to Defendant's Motion for Summary Judgment (Clerk's Doc. No. 22).

The "team leader" concept (among the RA's) was used at the Local Census Office between November 2005 and January 2006 approximately. The team leaders' role was to act as a communication conduit between the managers and the approximately 25 RA's. To this end, the managers would regularly meet with the team leaders, who would then disseminate information to the remaining RA's. The designation of a RA as a "team leader" did not involve any extra pay or other employment benefits. Drazic Decl. at ¶ 10; Pl. App'x, EEOC Hearing Tr. at Vol. I, p. 41. In November 2005, four RA's, including Latif, were designated as team leaders by Russell Payne, the Assistant Manager for Recruiting.[3]

## A. Failure to Attend Recruitment Blitz

A recruitment "blitz" was a term used to refer to saturating an area with RA's to inform the community of the job opportunities available with the census. One such blitz was planned by the Austin Local Census Office for Saturday, January 7, 2006, and all of the RA's were expected to work during the blitz. Each team leader was given a tract, which was further divided among the team members. Allen Decl. at ¶ 28; Drazic Decl. at ¶ 13.

On Thursday, January 5, 2006, Drazic directed the Office Operations Supervisor Homa Caldwell-Tomas to inform all of the team leaders of a meeting to be held on Friday morning (January 6) to discuss the upcoming blitz and to obtain the recruiting material to be passed out to each team member. Latif was informed of the Friday team leaders' meeting by Caldwell-Tomas. Caldwell-Tomas Aff. at 258; Drazic Decl. at ¶ 14. Latif did not attend the team leaders' meeting, but on Friday evening, Latif called Drazic at home. During this conversation, Drazic discussed the

---

[3]Russell Payne ("Payne") served as the Assistant Manager for Recruiting until his departure in December 2005. Jesse F. Drazic ("Drazic") assumed the Assistant Manager for Recruiting position on December 25, 2005.

blitz with Latif and directed Latif to pick up the recruiting materials from the Austin Local Census Office on Saturday morning (January 7). Drazic Decl. at ¶ 15. The team leaders had also been instructed to check in with Caldwell-Tomas to let her know that they were in the field participating in the blitz. *Id.* at ¶ 16.

On Saturday, January 7, 2006, the day of the blitz, Latif failed to pick up the recruiting materials for his team. *Id.* Latif and his team also failed to check in with Caldwell-Tomas for the blitz. *Id.*; Caldwell-Tomas Aff. at 259. Drazic was able to contact one of Latif's team members, Ben Cardenas, who informed Drazic that he had not seen or heard from Latif on Friday or Saturday. Drazic then informed Cardenas of the blitz assignment and further instructed him to contact his team members so that they could participate in the blitz. Drazic Decl. at ¶ 17.

On the Monday following the blitz, January 9, 2006, Latif did not appear for the weekly morning meeting for the RA's. Latif later called on his cell phone, but because the phone connection was bad, Drazic could only make out that Latif was taking leave from work for a religious holiday that had previously been approved by the former Assistant Manager for Recruiting, Russell Payne. Latif also informed Drazic that he would be back on Tuesday or Thursday. *Id.* at ¶ 18.

Because of Latif's continued absence from work, and because of his failure to lead the team during the January 7 blitz, Drazic recommended that another RA replace Latif as the team leader to coordinate the team's activity for another upcoming blitz weekend. Allen Decl. at ¶ 30. Shortly thereafter, Ben Cardenas was designated as a team leader in place of Latif.

**B.    Time-Sheet Inconsistency**

When Latif returned to work on Tuesday, January 17, 2006, Latif submitted his time sheets (Form DD-308) for January 6 and 7, 2006. *See* Defendant's Motion for Summary Judgment, at

Exhibit 2. The time sheets indicated that Latif had worked on January 6 and 7, 2006, despite the fact that he did not attend the team leaders' meeting on January 6, did not pick up the recruiting materials for his team, did not advise his team of the January 7 blitz, and did not check in with Caldwell-Tomas on January 7. Allen Decl. at ¶ 31; Drazic Decl. at ¶ 21. In his time sheet for January 6, Latif reported that he had worked 8 hours while visiting the Southeast Walgreens and Southeast Bookstores and had driven 42 miles. *See* Defendant's Motion for Summary Judgment, at Exhibit 2. For January 7, Latif reported that he had worked in the Southwest Blitz Tract for 3 hours and had driven 18 miles. *Id.*

On Wednesday, January 18, 2006, a meeting was held between the Austin Local Census Office Manager (Mr. Allen), Drazic, Caldwell-Tomas, and Latif. Caldwell-Tomas Aff. at 260–61; Allen Decl. at ¶ 32; Drazic Decl. at ¶ 22. One part of the discussion was the fact that Latif had disappeared during a mandatory blitz and left his team without a team leader and without any guidance on what to do during his absence. Allen Decl. at ¶ 32; Drazic Decl. at ¶ 22. Another part of the discussion related to Latif's failure to submit his PRISM forms, which should have been submitted with his time sheets. Allen Decl. at ¶ 32. During the meeting, Mr. Allen directed Latif to submit his PRISM reports in support of the time sheets. Drazic Decl. at ¶ 22. At the meeting, Latif did provide a verbal report regarding two types of businesses that he had visited on January 6 and 7, 2006. Allen Decl. at ¶ 32; Drazic Decl. at ¶ 22.

After the meeting, Mr. Allen directed Latif, Drazic, and Caldwell-Tomas to submit written statements to him regarding their actions leading to the January 18 meeting by Friday, January 20, 2006. Allen Decl. at ¶ 33. Drazic and Caldwell-Tomas timely submitted their written summaries

surrounding Latif's disappearance for the January 7 blitz. *Id.* at ¶ 34. However, Mr. Allen states that Latif failed to submit any written statement as instructed.[4] *Id.* at ¶ 35.

Mr. Allen also directed Drazic to have a Quality Control ("QC") check conducted to determine the accuracy of Latif's oral information submitted at the meeting regarding the businesses that he had visited during January 6 and 7, 2006.[5] *Id.* at ¶ 33. Drazic then directed another RA, Scott Lormand, to perform a blind QC check of some of the businesses that Latif reported he had visited on January 6 and 7. Drazic Decl. at ¶ 23.

On January 24, 2006, Lormand reported his QC findings to Drazic, which suggested that Latif had not visited the businesses that he previously asserted he had visited. Drazic Decl. at ¶ 24; *see also* Defendant's Motion for Summary Judgment, at Exhibit A (Lormand's Report). Another meeting was held with Latif this same day, in which Mr. Allen informed Latif that a check had been performed of the drugstores and bookstores in the southeast section, and that check had failed to confirm Latif's assertion that he had worked on January 6 or 7. Allen Decl. at ¶ 37. In reply, Latif offered that he had been to different types of businesses than what was originally reported. Mr. Allen then directed Latif to submit his detailed written information to the Local Census Office by the close of business on the following day, January 25.[6] *Id.*

---

[4]Latif stated in a January 24 meeting that he had put the report on Drazic's desk on January 20. However, no office employee had observed Latif in the Austin census office on January 20, and Latif could not identify who unlocked the front door to the office to allow him access. Allen Decl. at ¶ 35. This disputed fact is not material to the resolution of Defendant's motion.

[5]QC checks are performed to ensure the accuracy of the RA's submissions. QC checks are "blind" checks to avoid any possibility that the individual performing the check might shade the findings to create a problem for a disliked co-worker. Drazic Decl. at ¶ 23.

[6]Shortly after the meeting, Latif called to explain that he had to be out of town for a court date on January 25 and 26. It was agreed that he would submit the PRISM forms on January 27, 2006.

When Latif submitted the PRISM forms on January 27, 2006, the information on the forms was different than the oral information that he had provided earlier. Drazic Decl. at ¶ 25; Defendant's Motion for Summary Judgment, at Exhibit 3. On January 30, 2009, Drazic himself performed a QC check on the PRISM forms due to the discrepancy, and he reported his findings to Mr. Allen the next day. Drazic Decl. at ¶¶ 26–27. Drazic's investigation determined that Latif visited the business locations on the PRISM forms on January 27, rather than on January 6 and 7 as Latif had indicated earlier. *Id.* at ¶ 27. Drazic then recommended to Mr. Allen that Latif be fired for falsifying documents, as his PRISM forms were inconsistent with the information he previously provided and with Drazic's QC check. *Id.*

Drazic directed Latif to go home and not report for work until the matter was straightened out.[7] Drazic Decl. at ¶ 28. On the same day that Mr. Allen received Drazic's recommendation that Latif be fired, Mr. Allen was informed that Latif had initiated an EEOC complaint. Allen Decl. at ¶ 42. Mr. Allen was advised that terminating Latif at that point might appear retaliatory. *Id.* Because of this concern, no further action was pursued on the matter; however, Latif was not called back to work.[8] Mr. Allen states that this was because he "did not trust that [Latif] would actually accomplish the work that he claimed to do." *Id.*

---

Allen Decl. at ¶ 39.

[7]Latif did not return to work for the Census Bureau.

[8]For purposes of this Report and Recommendation, the undersigned will assume that Latif was terminated, as it does not affect the undersigned's recommendation that summary judgment be granted.

## C.     Plaintiff's Claims

Latif now brings claims against his former employer[9] under Title VII.  After reviewing his complaint, it had appeared to the Court (and the Department) that Latif was asserting discrimination claims on the basis of both his religion and his national origin.  *See* Pl. Complaint, at ¶ 25 ("Plaintiff contends that he was discriminated against on the basis of his national origin and his faith."); Defendant's Motion for Summary Judgment, at 1.  However, Latif's response explicitly states that "there is no allegation of national origin discrimination in the original complaint."  Pl. Response, at 1.  Thus, despite the rather plain indications to the contrary in the Complaint, the response makes it clear that Latif is only bringing claims alleging discrimination on the basis of religion, and thus that he has abandoned the national origin discrimination claim contained in the Complaint.

Unfortunately, the confusion does not end there.  The allegations in the complaint also made it appear as if Latif was asserting a claim that he was subjected to disparate treatment on the basis of his religion, and also to a hostile work environment with respect to his religion.  The Department understandably drafted its motion in line with these allegations, arguing that under the *McDonnell Douglas* burden-shifting framework, Latif could not establish a prima facie case of discrimination, and even if he could, Latif could not demonstrate that the Department's legitimate nondiscriminatory reasons for its actions were merely a pretext for discrimination.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

In response, Latif states that this case should not be analyzed under the burden-shifting approach set forth by *McDonnell Douglas* and its progeny.  Rather, according to Latif, the proper test is as follows: in order to establish a prima facie case of religious discrimination under Title VII,

_____

[9]For ease of reference, the undersigned will refer to Defendant as "the Department."

a plaintiff must establish that (1) he had a bona fide religious belief that conflicted with an employment requirement, (2) he informed the employer of his belief, and (3) he was discharged for failing to comply with the conflicting employment requirement. Pl. Response, at 2 (citing *Trans World Airlines v. Hardison*, 432 U.S. 63 (1977); *Weber v. Roadway Exp., Inc*. 199 F.3d 270, 273 (5th Cir. 2000); *Young v. Southwestern Savings and Loan*, 509 F.2d 140, 143 (5th Cir. 1975)). In other words, despite the allegations in the complaint, Latif's response clearly states that he is bringing a claim that the Department failed to accommodate his religious requirements.[10]

Regardless of the nature of Latif's discrimination claims, the Department has moved for summary judgment on them. The Department argues that Latif's failure to accommodate claim must fail because (1) recruiting at houses of worship was not an employment requirement; and (2) Latif cannot establish that he was discharged for failing to recruit at houses of worship. As for the hostile work environment and disparate treatment claims, the Department argues that Latif cannot prove essential elements to establish a prima facie case of either a hostile work environment or disparate treatment claim, and even if he could, Latif cannot demonstrate that the Department's legitimate nondiscriminatory reasons for its actions were merely a pretext for discrimination.

--------

[10]The confusion is actually even worse than described in the text. In his response, Latif argues that the stated reason for his termination was a pretext for discrimination, suggesting that the burden-shifting approach *is* applicable to this case. Latif even cites to *Abraham v. Diagnostic Center Hospital Corp. of Texas*, 138 F. Supp. 2d 809 (S.D. Tex. 2001), stating that it provides a "useful framework" for evidence of pretext—this, despite the fact that *Abraham* used the *McDonnell Douglas* burden-shifting approach Latif claims is inapplicable here. Moreover, *Abraham* did not involve a failure to accommodate claim, but rather a disparate treatment claim. Given this, the undersigned will analyze this case as if it also raised disparate treatment and hostile environment claims, as Latif's briefing and Complaint fail to make it clear just what he is claiming.

## II. ANALYSIS

### A.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue is material if its resolution could affect the outcome of the action." *Commerce and Indus. Ins. Co. v. Grinell Corp.*, 280 F.3d 566, 570 (5th Cir. 2002). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, courts must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Furthermore, courts "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

"[T]he nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The nonmovant may not rely on mere allegations in the pleadings. *Id.* Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a proper motion for summary judgment. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). Rather, the nonmoving party must set forth specific facts showing the existence of a "genuine" issue concerning every essential component of its case. *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777 (5th Cir. 1997). The

standard of review "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by the Court. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B.**  **Failure to Accommodate**

Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1). An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship. *Eversley v. MBank Dallas*, 843 F.2d 172, 175 (5th Cir. 1988). "Undue hardship" exists, as a matter of law, when an employer is required to bear more than a *de minimis* cost. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *Brener v. Diagnostic Center Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).

A Title VII plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To establish a prima facie case of religious discrimination under Title VII for failure to accommodate, a plaintiff must establish that he had a bona fide religious belief that conflicted with an employment requirement, that he informed the employer of his belief, and that he was discharged

for failing to comply with the conflicting employment requirement. *See Brener*, 671 F.2d at 144. With a prima facie case established, the burden shifts to the employer to show that it was unable to reasonably accommodate the plaintiff's religious needs without undue hardship. *Id.*

### 1. No Employment Requirement to Attend Mass

In Latif's response, Latif argues that the first two factors of a failure to accommodate claim are not at issue in this case. *See* Pl. Response, at 4 ("[T]he Agency has not disputed that Plaintiff had a bona fide religious belief which conflicted with the requirement that he attend Mass, or that he had informed the employer of this conflicting belief."). While the Department does not dispute that Latif informed his supervisors of his conflicting beliefs, Latif is plainly mistaken as to the first factor. Contrary to Latif's assertion, the Department specifically argues that recruiting at houses of worship was *not* an employment requirement, but rather was one of the many places RA's could perform their recruiting duties. In support, the Department points to evidence that RA's such as Latif could elect not to recruit at faith-based organizations without sustaining any adverse employment action. *See* Defendant's Motion for Summary Judgment, at 7; Drazic Decl. at ¶ 9; Allen Decl. at ¶¶ 21–23. Not only does Latif fail to dispute this evidence, but the evidence Latif presents also supports this proposition. For example, Victor Meza, another RA and team leader, testified that he "never once went into any church during the time [he] was there" and was not criticized. *See* Pl. App'x, EEOC Hearing Tr. at Vol. I, pp. 203–204. And while Elaine Cohen, another RA, testified that there was an *emphasis* on attending churches for recruiting purposes, she also stated that she made an effort to find locations that were not church related, and when asked if she ever got in trouble for failing to show up on Sunday, or if she had ever been removed her from her position because she failed to show up on Sunday, she said that she had not. *See* Pl. Appd'x, EEOC Hearing Tr. at Vol.

II, pp. 12, 15-16. Notably, while Latif alleges that he was given a disciplinary form to sign that purportedly reprimanded him for his refusal to attend mass, this statement is not accompanied by the form itself, or by any other summary judgment evidence that supports this allegation. *See* Pl. App'x I, ¶ 62.

Latif has failed to establish the first element of a prima facie case of a failure to accommodate claim. Specifically, Latif has failed to show that he has a bona fide religious belief that conflicted with an employment requirement, as there was no employment *requirement* that he attend mass (or any other church service).[11]

## C.    Hostile Work Environment

A plaintiff may establish a Title VII violation based on religious discrimination that created a hostile work environment. In order to establish a hostile working environment claim, a plaintiff must prove that (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the plaintiff's protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002); *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

---

[11]Despite Latif's insistence that this case should be analyzed as a failure to accommodate claim, it appears Latif is really arguing that he was terminated because of his religious beliefs generally, not due to his refusal to perform a specific job requirement. *See* Pl. Response, at 5 ("A genuine issue of material fact exists with regard to the third prong of the test, that Latif was demoted and/or discharged because of his religious belief."). Whether Latif was discharged because of his religious belief(s) is not what the third prong of a failure to accommodate claim requires. Rather, what Latif has to show under the third prong of a failure to accommodate claim is that he was discharged for failing to comply with an employment requirement that conflicted with his religious beliefs. *See Brener*, 671 F.2d at 144. The broader issue of whether Latif was terminated because of his religious beliefs will be discussed in the context of his disparate treatment claim.

For harassment to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). In deciding whether a workplace constitutes a hostile environment, courts may consider the following circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

The conduct to which Latif objects does not rise to the level of a hostile environment. Indeed, when the record (as opposed to the Plaintiff's brief[12]) is read in its entirety, it turns out that the evidence of an allegedly hostile environment boils down to a single supervisor stating perhaps 20 times over a seven month period that he could not understand "how the hell they let you into the office with Friday afternoons off," *see* Pl. App'x, EEOC Hearing Tr. at Vol. I, p. 62-65, comments that Latif argues were "designed to belittle and shine the spot-light on Plaintiff's faith." Pl. Response, at 4–5. While these comments may have made Plaintiff uncomfortable, this alone is not sufficient to create a hostile environment. The comments were not severe, and they certainly were not humiliating or physically threatening to Latif. Further, Latif offers no evidence that the comments interfered with the performance of his duties. Therefore, the behavior demonstrated by the summary judgment record is not sufficiently severe or pervasive such that it altered the conditions of Latif's employment, created an abusive working environment, or unreasonably

[12]As set forth in the next paragraph, the Plaintiff's brief and factual appendix take some liberties with the record, and contain several statements without citation to the record, and others which are not supported by the record citations they list.

interfered with his work performance. While this conduct may be relevant evidence for Plaintiff's disparate treatment claim, it is not sufficient to demonstrate the existence of a hostile work environment.

Moreover, many of Latif's contentions regarding the severity of the conduct allegedly exhibited by management are not supported by the record. For instance, Latif contends that Meza, another RA, explained how "management openly laughed at Latif's faith-based dilemma," but Meza's testimony does not support this assertion. Meza was specifically asked during the EEOC hearing, "Did [management] say, Well, Latif can't be here on Friday and then laugh?" Meza then responded, "It was more the wink, wink. We know why. So he was off doing his thing." *See* Pl. App'x, EEOC Hearing Tr. at Vol. I, p. 142. Latif also contends that "off-color" comments were made about him in meetings, citing Meza's testimony, but what Latif does not mention is that when Meza was asked specifically what some of these comments were, Meza responded that he could not give a specific example, even after significant urging by the ALJ to provide some descriptions of these alleged remarks. *Id.* at 239. Meza instead explained that when Latif was not present, management would say (or imply), "it's like, you know, he's off doing his thing." *Id.* at 240. In other words, Meza had the impression that management would make references as to why Latif was not able to work on Fridays, but Meza did not say, as Latif claims in his brief, that management "openly laughed at Latif's faith-based dilemma," nor could Meza identify a single "off-color" comment that management allegedly made about Latif. In short, the evidence does not support the claims made in the brief.

Because the conduct complained of is not sufficient to demonstrate that Latif was exposed to a hostile work environment, summary judgment should be granted on this claim.

## D.    Disparate Treatment

"Because no one test can fully cover all of the different types of discrimination which are forbidden by Title VII and the different contexts in which claims of discrimination arise, the prima facie case a plaintiff must establish in a discrimination claim varies somewhat with the facts of each case." *Rubinstein v. Adm'rs of Tulane*, 58 F. Supp. 2d 702, 710 (E.D. La. 1998) (citing *Burdine*, 450 U.S. at 253 n.6 ); *see also McDonnell Douglas Corp.*, 411 U.S. at 802 n.13.   In the present case, Latif claims that the Department discharged him on the basis of his religious beliefs.  Therefore, to establish a prima facie case, Latif must present evidence that: (1) he was a member of an identifiable religion;[13] (2) he was qualified for the position he held;[14] (3) he was subjected to an adverse employment action; and (4) he was treated differently from others similarly situated.  *See Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rubinstein v. Adm'rs of Tulane*, 58 F. Supp. 2d 702, 710 (E.D. La. 1998); *Mireles v. City of San Antonio*, No. SA-98-CA-1050-FB, 2000 WL 33348258, at * 4 (W.D. Tex. March 20, 2000).

If a plaintiff shows a prima facie case, the burden shifts to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254.  If a defendant can produce such evidence, the plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons." *Id.* at 253.  The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.* at 256.  Of

---

[13]Latif is an Ahmadiyyat Muslim. Pl. App'x, EEOC Hearing Tr. at Vol. I, p. 34.

[14]The Department does not dispute that Latif was qualified for the position.

course, because the Court is reviewing this issue in the context of a summary judgment motion, this means that the plaintiff must at least demonstrate the existence of a fact question regarding whether the reason offered was the true reason.

       1.     *Prima facie case*

As an initial matter, the Department argues that the replacement of Latif as a team leader is not actionable because it does not qualify as an adverse employment action, and because Latif cannot identify a similarly situated individual who failed to guide his team during a blitz who was treated more favorably. Latif does not respond to either of these arguments, but rather tries to show that the circumstances of his removal is somehow evidence of discriminatory intent. The undisputed evidence shows that the "team leader" designation was a short-lived concept, and that being a team leader did not involve any extra pay or extra benefits. *See* Drazic Decl. at ¶ 10; Pl. App'x, EEOC Hearing Tr. at Vol. I, p. 41. The Department shows that the team leader's role was merely to act as a communication conduit between the managers and the approximately 25 RA's. Drazic Decl. at ¶ 10; Pl. App'x, Allen Deposition, at p. 12. Thus, Latif's removal as a team leader is not an adverse employment action that can support a discrimination claim under Title VII. Of course, because Latif was told not to come back to work shortly after he was removed as a team leader, this is somewhat of a non-issue.

As for Latif's discrimination claims in regard to his termination, the Department argues that Latif cannot establish a prima facie case because Latif cannot identify a similarly situated individual who failed to participate in a mandatory blitz operation, but who later claimed to have worked it, that was not terminated. In other words, Latif cannot establish that he was treated less favorably than others outside the protected class. *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d

507, 514 (5th Cir. 2001) ("[T]o establish disparate treatment a plaintiff must show that the employer gave preferential treatment to another employee under 'nearly identical' circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees.") (quotation and alteration marks omitted).  Again, Latif does not directly respond to this argument.  The only evidence Latif offers about less favorable treatment is his claim that the Department treated him differently in regard to the QC check it performed on him.  Specifically, Latif asserts that "the Agency has produced no evidence to suggest that this process of 'quality control' has been conducted with regard to any other employee."  Pl. Response, at 9–10.

First, it is not the defendant's duty to show they treated everyone the same; it is the plaintiff's burden as part of his prima facie case to show others were treated more favorably.  *Abarca*, 404 F.3d at 941.  Furthermore, the Department had a specific reason to conduct the QC check on Latif, given that he did not attend the Team Leaders' meeting on January 6, he did not pick up the recruiting materials for his team, he did not advise his team of the January 7 blitz, and he did not check-in with Caldwell-Tomas on January 7, yet he submitted time sheets when he returned claiming he worked during that weekend.  Allen Decl. at ¶ 31; Drazic Decl. at ¶ 21.  Moreover, the Department did state in affidavit testimony that "QC checks are performed routinely to ensure the accuracy of the RA's submissions,"  Drazic Decl. at ¶ 23, and Latif does not provide evidence to contest this assertion.  Nor does Latif offer anything regarding the circumstances of when other QC checks were performed at the Department.  Thus, Latif does not make a prima facie showing that others were treated more favorably in regard to the QC checks.

Because Latif has not offered evidence that he was treated differently from other similarly situated employees, the undersigned does not believe Latif has established a prima facie case that

the Department discharged him on the basis of his religious beliefs.

2.    *The Department's Asserted Nondiscriminatory Reason*

Even if Latif had established a prima facie case, the Department argues that it had a legitimate, nondiscriminatory reason to terminate Latif, and Latif cannot establish that the Department's reason for terminating Latif was a pretext for discrimination.  Specifically, the Department has offered evidence that Latif falsified his time sheets by saying he visited certain businesses on January 6 and 7 when a QC check showed he did not visit these businesses until January 27.  This establishes a legitimate nondiscriminatory reason for terminating Latif, which shifts the burden back to Latif to demonstrate that there is a fact question regarding whether "the legitimate reasons offered by the defendant were not its true reasons." *Id.* at 253.  As noted above, the facts that the court looks at on this point relate to whether "a discriminatory reason more likely motivated the employer," or whether "the employer's proffered explanation is unworthy of credence."  *Id.* at 256.

3.    *Evidence of Pretext*

Latif argues that the Department's stated reason for his termination was indeed a pretext for discrimination, and that a genuine issue of material fact exists as to whether he was actually terminated because of his religious beliefs and practices.  Latif cites to *Abraham v. Diagnostic Center Hospital Corp. of Texas*, 138 F. Supp. 2d 809 (S.D. Tex. 2001), in an attempt to show that the evidence he has submitted is sufficient evidence of pretext to defeat summary judgment.

In *Abraham*, the plaintiff had submitted evidence that (1) his supervisors made remarks disparaging the plaintiff's religious beliefs, evidencing discriminatory animus; (2) his supervisors treated his absences differently than the absences of employees who did not openly display their

19

religious beliefs; and (3) his supervisors made the decision to terminate his employment, a result that the attendance policy did not require. *Id.* at 814. The defendant in *Abraham* responded by arguing that it is well-settled that "stray remarks" alone will not overcome overwhelming evidence corroborating the defendant's nondiscriminatory rationale for its employment decision. *Id.* The *Abraham* Court then suggested that remarks may serve as sufficient evidence of discrimination if the comments are: (1) related to the protected class; (2) proximate in time to the employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue. *Id.* at 814–15 (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655–56 (5th Cir. 1996)). The court also noted how comments that are "vague and remote in time" are usually insufficient to support an inference of discrimination. *Id.* (citing *Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733 (5th Cir. 1999)).

This case is distinguishable from *Abraham* in many important respects, and Latif has failed to submit sufficient evidence of pretext to defeat summary judgment. For instance, in *Abraham*, the comments directly referred to the plaintiff's religious beliefs in a disparaging manner. *See id.* at 814. In this case, the supervisory statements did not disparage Latif's religious beliefs in any way, but rather expressed annoyance that Latif was unavailable for meetings on Friday afternoons. Second, Latif offers no evidence that his supervisors treated his absences (or his time sheet discrepancies) differently than those of employees who did not openly display their religious beliefs. Third, Latif does not argue that his supervisors made the decision to terminate his employment when the employer's policies did not require such result, as was the case in *Abraham*. Fourth, the comments were remote in time, as Payne had ceased working for the Department several months before Latif was discharged. Finally, the comments were not related to the employment decision at issue, as Latif

does not argue that he suffered any adverse employment action because he did not work on Friday afternoons.

In another attempt to show a fact issue on pretext, Latif argues that "it is telling that Allen dispatched an employee to investigate Latif's report even before receiving any indication of a disparity in the paperwork." What Latif ignores is that management had reason to believe that Latif did not attend the blitz the weekend it happened, yet, when Latif returned on January 17, Latif submitted time sheets for that weekend anyway. Thus, the QC check the Department performed prior to receiving the PRISM form on January 27 does not show the Department was motivated by discriminatory animus as Latif claims, as the Department had a legitimate basis to conduct the check when he submitted the time sheets on January 17.

Latif also appears to argue that the Department's stated reason for discharging him is unworthy of credence, stating that "[t]he Agency's assertion that the data entry forms and the time sheets did not match is simply not supported by the evidence." This, however, is inaccurate. As noted above, the Department submitted evidence showing that (1) Latif had not shown up for the blitz, yet submitted a Daily Pay and Work Record form (Form DD-308) claiming that he had worked that weekend; (2) Latif initially stated in the January 18 meeting that he had been to certain places that a subsequent QC check showed he had not visited; (3) the PRISM form Latif eventually submitted listed different places than what he had previously reported to his supervisors; and (4) a second QC check indicated that Latif had visited the places listed on the PRISM forms on January 27 rather than January 6 and 7 as he had claimed.

Therefore, even assuming Latif had established a prima facie case, Latif's claims fail because the Department has presented legitimate nondiscriminatory reasons for the termination, and Latif has

been unable to offer sufficient evidence to create a genuine issue of material fact either that the Department's actions were a pretext for discrimination or that illegal discrimination was a motivating factor in the Department's decisions. The evidence shows that the Department decided to discharge Latif for falsifying documents, as his PRISM forms were inconsistent with his previously submitted time sheets and with the Department's QC checks. Accordingly, the undersigned recommends that summary judgment be granted on this aspect of Latif's claim as well.

### III.  CONCLUSION

Based on the foregoing, the Court is of the opinion that Defendant's motion for summary judgment should be granted in its entirety. The Department is entitled to summary judgment on Latif's claim that his employer discriminated against him on the basis of his religion for failure to accommodate because the evidence shows that attending houses of worship was not an employment requirement. The Department is entitled to summary judgment on Latif's hostile work environment claim because the alleged behavior was not sufficiently severe or pervasive to support such a claim. Finally, the Department is entitled to summary judgment on Latif's claim that the Department discharged him on the basis of his religious beliefs (i.e. his disparate treatment claim) because Latif has failed to establish a prima facie case, and even assuming he had, Latif has failed to raise a fact question regarding whether Defendant's stated reason for discharging Latif was a pretext for discrimination.

### IV.  RECOMMENDATION

The undersigned Magistrate Judge **RECOMMENDS** that the District Judge **GRANT** Defendant's Motion for Summary Judgment (Clerk's Docket No. 22). Furthermore, because the undersigned recommends that summary judgement be granted on all of Plaintiff's claims, in the

event the District Judge accepts this recommendation, the undersigned **RECOMMENDS** that the District Judge **ENTER JUDGMENT** in this case that Plaintiff take nothing.

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).  To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 8th day of October, 2009.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE